UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| DAVID C. FAULKINGHAM, | ) |
| Plaintiff | ) ) ) |
| v. | )   Civil No. 04-48-B-K |
| PENOBSCOT COUNTY JAIL, et al., | ) ) ) |
| Defendant | ) |

### *MEMORANDUM OF DECISION[1] ON MOTION FOR SUMMARY JUDGMENT BY ALLIED RESOURCES FOR CORRECTIONAL HEALTH, INC. AND AL CHICON*

David Faulkingham brings this 42 U.S.C. § 1983 action complaining of his treatment at the Penobscot County Jail (PCJ) while he was a pretrial detainee awaiting the resolution of federal criminal charges against him. Two defendants, Allied Resources for Correction Health, Inc. (ARCH) and Al Chicon, a physician assistant for ARCH, have filed a motion for summary judgment (Docket No. 89) to which Faulkingham has not responded. I **GRANT** the unopposed motion for summary judgment motion for the following reasons.

### *Discussion*

### *Summary Judgment Standard*

ARCH and Cichon are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that they

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id. I review the record in the light most favorable to Faulkingham and I indulge all reasonable inferences in his favor. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000) (emphasis added).

The fact that Faulkingham is a pro se plaintiff does not absolve him of the pleading burden set forth in Rule 56. See Parkinson v. Goord, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); see also Sirois v. Prison Health Servs., 233 F.Supp.2d 52, 53-55 (D. Me. 2002). While Faulkingham's complaint may be held to a less stringent pleading standard under Haines v. Kerner, 404 U.S. 519, 520 (1972), his pro se status does not shield him from Rule 56's operative provision under subsection(e) requiring the pleader to "set forth such facts as would be admissible in evidence."

"By failing to file the required response within the time prescribed by the applicable local rule," Faulkingham has waived "the right to controvert the facts asserted by the moving party in the motion for summary judgment and the supporting materials accompanying it. The court will accept as true all material facts set forth by the moving party with appropriate record support. If those facts entitle the moving party to judgment

as a matter of law, summary judgment will be granted."  NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 8 (1st Cir. 2002).

### *Eighth/Fourteenth Amendment Standard for Deliberate Indifference*

The United States Supreme Court has framed the broad outlines of the deliberate indifference inquiry in two cases: Estelle v. Gamble, 429 U.S. 97 (1976) and Farmer v. Brennan, 511 U.S. 825 (1994).  Estelle identified in the Eighth Amendment protection the "government's obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103. The Court observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Id.; see also Helling v. McKinney, 509 U.S. 25, 32, (1993) ("The substantive limits on state action set by the Eighth Amendment," when it "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs" including food and medical care).

In Farmer the Court more precisely articulated the standard a plaintiff in Faulkingham's shoes must meet to hold a prison official or entity liable for Eighth Amendment claims of this variety.  It identified two prongs. The deprivation alleged must be "objectively 'sufficiently serious.'"  511 U.S. at 834 (quoting Wilson v.Seiter, 501 U.S. 294, 298 (1991)); Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir.2002) ("The deprivation suffered by the prisoner must be objectively sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities," emphasis added). Second, under Farmer, a defendant must have a culpable state of mind, which means that personnel were deliberate in their indifference to Faulkingham's health or safety. Id.; see also Walker v. Peters, 233 F.3d 494, 99 (7th cir.2000) ("We do not

3

consider what a reasonable doctor would have done. That is an objective test, and Farmer dictated a subjective analysis. Nor is it enough to show that a prison doctor committed malpractice. At the very least, a prison official must act or fail to act despite his knowledge of a substantial risk of serious harm.") (citations omitted).

*Undisputed Material Facts*

*Cichon's Qualifications and the Arrangement between Cichon, ARCH, and the PCJ*

During March through August 2004, Alfred Cichon was an independent contractor with ARCH performing services as a physician assistant. ARCH is a corporation engaged in the business of supplying healthcare professionals to county correctional facilities. Cichon has contracted to provide his services as a physician assistant to ARCH since 1992. Prior to that Cichon worked in the emergency departments of a number of Maine hospitals following a career in the United States Air Force as a medical technician. Cichon is certified by the American Board of Physician Assistant Practice and has a Bachelor of Science degree as a physician associate and a Master of Public Administration degree. He is registered with and licensed by the State of Maine to perform the services of a physician assistant. All physician assistants and/or nursing staff with which ARCH contracts for services must have completed all necessary training to provide healthcare services and must maintain appropriate licenses with the State of Maine. ARCH does not provide any training regarding healthcare services to its independent contractors because it hires only persons who have already completed required training and have obtained appropriate licenses to practice. ARCH does provide a workplace orientation at each of the county facilities with which it has a contract to provide medical services. However, each county jail provides a security orientation.

Each individual healthcare professional with whom ARCH contracts is obliged to maintain the appropriate skill, training, and licensure necessary to fulfill his/her contractual obligations.

The primary tasks assigned to ARCH healthcare professionals are providing medical services to inmates of the various county jails. The providing of medical services to jail inmates is governed by state law, including the Maine Standard for Jails promulgated by the Maine Department of Corrections, as well as policies promulgated by the individual county jails. Medications, supplies, tools and equipment used to care for inmates are all provided and paid for by the jails. The duty, activities, and times for providing services are specified by the county jails. The healthcare providers indicate their willingness to work certain available periods during the month according to contract and their level of licensure. They also specify locations at which they are willing to contract. Healthcare providers who contract with ARCH are allowed to provide similar services to the general public and to advertise the availability of such services, separate and apart from any work they contract to perform at the county jails for ARCH. The contractors are responsible for the quality of their work and its completion and are required to maintain and show proof of their own professional malpractice insurance. ARCH does not provide any benefits such as sick pay, vacation, and the like to the independent contractors. The independent contractors are provided with a Form 1099 and ARCH does not withhold any taxes on amounts paid under the contract to the healthcare professionals.

### *Faulkingham's March through August 2004 Treatment at the PCJ*

During the March-August 2004 period of time, David Faulkingham was an inmate at the PCJ. Cichon was not the only healthcare provider who contracted with ARCH to provide healthcare services as an independent contractor to the PCJ during the period of Faulkingham's incarceration. Other contractors provided coverage for some of the sick calls during which Faulkingham was examined and/or assessed for his complaints of various illnesses and/or injuries. Cichon was involved at various points in assessing both the hemochromatosis complaint and the shoulder injury complaint made by Faulkingham at the PCJ. Cichon is familiar with the treatment given to Faulkingham, as a result of his review of Faulkingham's chart and his personal involvement in Faulkingham's care. Cichon believes that, based on his education and experience, the treatment provided to Mr. Faulkingham for these complaints were appropriate. Treatment at the jails and prisons in the State of Maine with which Cichon is familiar may generally be described as conservative treatments. While many illnesses or injuries have a wide range of options available as treatment, the inmates generally receive conservative treatment, provided that type of treatment is appropriate and within the range of acceptable treatments for that particular complaint. Cichon believes that the treatment ordered by him or other ARCH healthcare contractors during Faulkingham's incarceration at PCJ, while generally conservative, met the standard for necessary and appropriate treatment. Cichon never withheld any necessary and appropriate treatment from Faulkingham. At all times, Cichon contends, he used his training and experience as a physician assistant to correctly assess Faulkingham's complaints, and prescribed accepted types of treatment under the circumstances.

### *Prescriptions for Inderal, Seroquel and Valium*

When Faulkingham was transferred from the Maine State Prison to PCJ he had prescriptions for Inderal, Seroquel, and Valium. Faulkingham was taking Inderal to regulate his heart rate and blood pressure caused by hyperthyroid disease. Faulkingham was taking Seroquel as an anti-psychotic due to psychological issues. He was taking Valium as an anti-anxiety medication. Faulkingham presented evidence that he had been prescribed medication by an outside physician prior to his incarceration.

Because many inmates claim they have prescriptions for various medications when they present at the jail, jail policy mandates that all prescriptions be verified with the physician prescribing them before they are administered by the jail to the inmates. Because of an intervening weekend during which his doctor's office was closed, it took several days to confirm at least some of the medications that Faulkingham had been prescribed.  According to Faulkingham's medical chart, he was arrested on March 18, 2004, and his prescriptions were verified on Monday, March 22, 2004. Faulkingham claims that he suffered from anxiety, heart palpitations, increased blood pressure and fever between March 18 through 25, 2004, as a result of not receiving medications. Faulkingham's medical condition returned to normal when his medications were resumed on March 25, 2004.  Faulkingham's own physician had taken him off these medications for a period of four months without lasting adverse conditions.

### *Hemochromatosis*

Faulkingham represented to Cichon that he suffered from a disease known as hemochromatosis, which is a condition in which the body stores an excessive of amount of iron in the blood, which symptoms include arthritis-type affect on the joints, and

7

inflammation of the liver. This condition is sometimes treated with phlebotomy, a periodic drawing of blood from the patient to lower the body's iron levels.  In examining and assessing Faulkingham, as well as familiarizing himself with the classic symptoms of hemochromatosis, it was not possible for Cichon to diagnose him as having that condition with any certainty.  Cichon ordered that blood tests be performed on Faulkingham in order to obtain the necessary information to accurately assess his condition.  Blood tests were taken on March 29, 2004, May 21, 2004, May 24, 2004, June 12, 2004, July 19, 2004, and July 26, 2004 and all these test results are documented in Faulkingham's chart at the PCJ.  To the extent any tests showed abnormal iron levels in the blood, the levels noted were only minimally above that which is considered normal.  During this time Faulkingham also continued to show symptoms, or lack of symptoms, that caused Cichon to question whether Faulkingham, in fact, suffered from Hemochromatosis.

      Cichon sought advice from Dr. Scott B. Stern, of Gastroenterology Associates of Eastern Maine who had seen Faulkingham as a patient prior to his incarceration.  Cichon provided Dr. Stern with all of the results of the various blood tests, and also his observations and assessments of Faulkingham. Cichon then discussed Faulkingham's condition with Dr. Stern, who followed that discussion with correspondence dated July 30, 2004. In Cichon's phone call with Dr. Stern, there was some discussion of the fact that Faulkingham was presently incarcerated and Cichon told Dr. Stern that an inmate would not be held at a county jail if he had a sentence to serve that was longer than one year. In his July 30, 2004, letter, Dr. Stern referred to his understanding that Faulkingham was "apparently going to be released in the upcoming year," which indicated to Cichon that there was some misunderstanding on Dr. Stern's part concerning what Cichon had

8

told him about the maximum length of incarceration at a county jail.  At that time, Cichon did not know what length ofسentence Faulkingham was facing. Dr. Stern and Cichon discussed the use of phlebotomy as a treatment for dealing with Faulkingham's iron overloading and Dr. Stern agreed that the clinical picture did not support a diagnosis for classic hereditary hemochromatosis in Faulkingham's case.  Dr. Stern reiterated that view in his July 30, 2004, letter, calling the diagnosis of hemochromatosis in Faulkingham's case "questionable." Nevertheless, because phlebotomy is a benign treatment, Dr. Stern thought such treatment was a reasonable option but also indicated that although phlebotomy could be performed, there was no urgency in doing so, and that it definitely could wait for up to a year, at which time Dr. Stern apparently believed mistakenly that Faulkingham would be released from jail.  Dr. Stern's direction to Cichon was to continue to monitor Faulkingham's condition with blood tests every three to four months and as long as the results remained stable.  Dr. Stern advised that no "aggressive treatment" would be required.  While Dr. Stern apparently was confused about how much time Faulkingham might have remaining as an inmate, it was clear to Cichon that the diagnosis of hemochromatosis was questionable, and that phlebotomy, while it could be pursued as a benign treatment, was not urgently needed.  Cichon also understood that he was to continue blood tests for Faulkingham every three to four months, and that, should his iron levels remain stable, no additional treatment was required.

Within a week of receiving Dr. Stern's directions in his July 30, 2004, letter, however, Faulkingham was transferred to the Cumberland County Jail.  From that point forward, Faulkingham was removed from Cichon's care.  ARCH does not contract for medical services with Cumberland County.  Cichon had no advance notice that

9

Faulkingham's transfer was going to occur. Cichon's entire period of contact with Faulkingham occurred during March through August 2004, during which period Faulkingham was seen by Cichon and others who contracted with ARCH to provide coverage at the PCJ and blood tests were ordered repeatedly to monitor his blood iron levels.

### *Shoulder Injury*

On or about June 21, 2004, Faulkingham was in the vicinity of some type of altercation among other inmates and, as a result, he claimed to have been pushed up against a wall, hitting his shoulder on the wall. Faulkingham complained that his shoulder was injured. He was assessed by medical staff regarding this alleged injury. Cichon was not the only person who contracted with ARCH to provide medical services to Penobscot County Jail during this time, and Faulkingham was also seen by healthcare providers other than Cichon with respect to this shoulder complaint. Faulkingham's chart from the PCJ documents reports of assessments performed on his shoulder on June 21, 2004, June 22, 2004, June 25, 2004, June 30, 2004, July 4, 2004, July 6, 2004, July 7, 2004, July 12, 2004, July 13, 2004, July 24, 2004, August 4, 2004, and August 9, 2004. In this early August period, Faulkingham was then transferred to Cumberland County Jail.

Based on Cichon's training, experience, and his examination of Faulkingham's shoulder, he believed Faulkingham had suffered, at most, a slight sprain of his shoulder joint. Cichon directed Faulkingham to ice down the joint for a day or two to alleviate any soft tissue swelling and advised him that he could take several hot showers throughout the day, which would help increase mobility and help relieve any residual stiffness in the joint. Generally, inmates at PCJ have the availability of taking a hot shower at any point

10

during the day so Cichon believed Faulkingham could simply follow his recommendation without any further action on his part.  Subsequently, Cichon learned that, as a result of his role in the altercation on June 21, 2004, Faulkingham had been placed in lockdown mode by the staff at PCJ.  As part of his lockdown restrictions, Faulkingham did not enjoy as much freedom of movement as other inmates and did not have access to the showers throughout the entire day as he normally would.  Cichon was not aware of Faulkingham's lockdown restrictions, nor was it the jail's normal policy to advise the healthcare providers when an administrative decision was made to place any particular inmate in lockdown.  Faulkingham believes he was denied extra showers for his alleged shoulder injury as a result of a miscommunication between Cichon and jail administrators.

Within a couple days of having been assessed on June 21, 2004, Faulkingham filed a grievance with jail officials, complaining that he was not being allowed access to hot showers throughout the day as Cichon had prescribed for him.  Faulkingham believes the grievance was filed on June 23, 2004, and it advised the jail administration that he was not getting the extra showers he had been prescribed.  He cannot say how the miscommunication occurred or whose responsibility it was.  Cichon did not have any role in the decision to place Faulkingham in a lockdown status and was not even aware that Faulkingham was subject to the limitations imposed by this lockdown status at the time he prescribed additional showers as treatment for shoulder stiffness.  During most of his incarceration at PCJ Faulkingham was held in disciplinary lock-up as he was deemed a threat to the well-being of the running of the jail.  Because he was in disciplinary lock-up,

Faulkingham had access to one shower per day, rather than the three showers that Cichon had recommended after June 21, 2004, to help treat Faulkingham's shoulder complaints.

Cichon did order an x-ray of Faulkingham's shoulder, and this x-ray was taken on August 3, 2004. The radiologist reading the film saw no fractures and described the soft tissue as "unremarkable." The radiologist did see the possibility of a separation of the AC joint but could not say that with certainty based solely on the films that had been taken. The radiologist suggested that the AC separation issue would have to be correlated by reference to the clinical history and possibly comparison films of the opposite shoulder and/or weight bearing films of the affected shoulder. By the time Faulkingham's August 3, 2004, shoulder x-rays ordered by Cichon were reviewed by a radiologist on August 9, 2004, and the results conveyed to Cichon through the radiologist's report of that date, Faulkingham had been transferred to Cumberland County Jail. As a result, it was not possible to follow up with additional x-rays suggested by the radiologist.

### *Disposition*

Faulkingham having filed no responsive statement of fact, I take all of these properly supported statements of material fact as true and cannot but conclude that Cichon and ARCH are entitled to judgment in their favor. The defendants have set forth a record that demonstrates that Faulkingham's treatment during his incarceration at PCJ was constitutionally adequate, although conservative. By not responding to the defendants' statement of material fact Faulkingham has failed to provide the court with any record material upon which I can draw a reasonable inference that Cichon (or any other ARCH employee) was deliberately indifferent to his medical care.

*Conclusion*

For these reasons I **GRANT** the motion for summary judgment filed by Al Cichon and Allied Resources for Correctional Health, Inc.

*So Ordered.*

August 10, 2005                    /s/ Margaret J. Kravchuk
                                   U.S. Magistrate Judge